Filed 11/18/14  P. v. O'Connell CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JASON SETH O'CONNELL,<br><br>    Defendant and Appellant. | H036994<br>(Santa Cruz County<br> Super. Ct. No. S810372) |

Defendant was convicted at his original court trial of burglary (Pen. Code, § 459),[1] lewd conduct (§ 288, subd. (a)), forcible lewd conduct (§ 288, subd. (b)), and aggravated sexual assault on a child (§ 269, subd. (a)(4)), and one-strike allegations (§ 667.61, subds. (d)(4) & (e)(2)) attached to the lewd conduct and forcible lewd conduct counts were found true.  He was sentenced to 50 years to life.  Defendant appealed, and the judgment was reversed.  The matter was remanded for retrial on the burglary, forcible lewd conduct, and aggravated sexual assault counts, and on the one-strike allegations. The lewd conduct conviction remained intact.

Defendant was convicted at the retrial before a jury of the aggravated sexual assault and burglary counts, and, after a bifurcated jury trial on the one-strike allegations

---

[1]     Subsequent statutory references are to the Penal Code unless otherwise specified.

attached to the lewd conduct count, those allegations were found true. The jury was unable to reach a verdict on the forcible lewd conduct count. Defendant pleaded no contest to that count and admitted one of the one-strike allegations attached to it after the court gave what it denominated an "indicated sentence" of a consecutive six-year determinate term for the forcible lewd conduct count. He was sentenced to a term of 25 years to life for the lewd conduct count and a consecutive term of 15 years to life for the aggravated sexual assault count. Instead of the "indicated sentence" of six years, the court imposed and stayed a concurrent 25 years to life term for the forcible lewd conduct count.

On appeal, defendant contends that (1) the trial court unduly restricted voir dire, (2) there is insufficient evidence to support the aggravated sexual assault count, (3) the trial court prejudicially erred in admitting testimony about the three-year-old victim's statements shortly after the incident because her statements were translated by her eight-year-old brother, (4) the trial court prejudicially erred in admitting the then 15-year-old victim's testimony at trial because it was unreliable and in admitting her hearsay statements because their admission violated defendant's confrontation rights, (5) admission of evidence of a prior incident under Evidence Code sections 1101, subdivision (b) and 1108 violated due process and Evidence Code section 352, (6) one statement by the victim of that prior incident should have been excluded as irrelevant and speculative, (7) the prosecutor committed prejudicial misconduct, (8) defendant's no contest plea to the forcible lewd conduct count and admission of the accompanying one-strike allegation were invalid because they were induced by judicial plea bargaining and the court did not impose the "indicated sentence," (9) instructing the jury at the bifurcated trial on the one-strike allegations that defendant had already been convicted of the lewd conduct count was prejudicial error, (10) the court violated section 654, and (11) the court was required to strike one of the two one-strike allegations attached to the lewd conduct count.

We conclude that the trial court must strike one of the two one-strike allegations attached to the lewd conduct count. We also conclude that the trial court imposed an unauthorized sentence for the forcible lewd conduct count. Accordingly, we reverse and remand for resentencing.

## I. Factual Background

In November 1998, three-year-old Y. lived in a two-story townhome in Santa Cruz with her parents and her eight-year-old brother. The bedrooms were on the second story of the townhome. A rear sliding glass door led to the backyard, where there was a tricycle, a bike, a "pony," and a brightly-colored, "toddler size slide."

Before going to bed on November 17, 1998, Y.'s mother checked that the front doors were locked. She saw that the rear sliding glass door was closed, but she failed to check that it was locked. She put Y. to bed in Y.'s bedroom, and she went to sleep in her bedroom with Y.'s father. All of the bedroom doors were open to the upstairs hallway. To reach Y.'s bedroom, a person coming from the first story would have to pass by the parents' bedroom. Around 2:00 a.m., Y.'s mother was awakened by Y. trying to crawl into bed with her. The mother picked Y. up and carried her back to Y.'s bedroom. Y. was wearing underwear, pajama bottoms, and a pajama top. The mother put Y. back into Y.'s bed and covered her up. The mother went back to bed in her own bedroom.

Defendant entered the townhome through the rear sliding glass door. He came upstairs, passed by the parents' bedroom, and came into Y.'s room. He removed his jacket, and her pajama bottoms and underwear. Defendant touched Y.'s earlobe, her lips, and her vagina, and he put his mouth on her lips and vaginal area. He pulled down his pants and put his penis into Y.'s mouth. She "tried to pull away" but was unable to do so because "[h]e was too strong . . . ." When she was finally able to pull away, she began screaming and defendant fled.

3

Y.'s mother was awakened by Y. screaming and then crying. As the mother got out of bed, she saw a shadow pass by in the hallway. When she entered the hallway, she smelled "a strong cigarette smell." No family member smoked. The mother went to Y.'s bedroom and found Y. kneeling on the floor next to her bed, wearing no pajama bottoms or underwear, and crying. The mother found Y.'s underwear and pajama bottoms on the floor next to her bed. The mother screamed for her husband and turned on the lights. She heard someone running down the stairs, and she saw defendant's black leather jacket on the floor of Y.'s bedroom. Y.'s mother knew that this jacket did not belong to anyone in the family. She picked up the jacket and threw it into the hallway. Nothing else in the home had been disturbed. Y.'s brother was still asleep in his bedroom. The mother called the police, and the father grabbed his gun, loaded it, and chased after the intruder, whom he saw through a window. The father saw a tall man in dark clothing running in the backyard. The rear sliding glass door of the home was open. The father screamed and fired a gunshot into the air.

The police arrived within a few minutes. The first police officer to arrive was Santa Cruz Police Officer Nicholas Paul Richards. Y. was in her mother's arms and was crying. The parents told Richards that a male intruder had been in Y.'s bedroom. The mother explained, outside Y.'s presence, what she had observed. The mother pointed out Y.'s underwear to Richards, and he saw next to them several drops of a substance that appeared to be semen. Richards then tried to communicate with Y. through the mother and had the mother ask Y. "what happened." The mother spoke to Y. in Spanish.[2] Y. understood both Spanish and English but spoke mostly Spanish. Y. "wasn't speaking" in response to Richards's question, but she "started pointing to her mouth . . . ." Y. opened her mouth and pointed to her open mouth two or three times. Richards asked the mother

---

[2]     The mother's first language was Spanish, but she was fluent in English.

to ask Y. "if somebody put something in her mouth and [Y.] nodded her head yes." Using a doll, Richards asked the mother to ask Y. "to point to on the doll what area that this person tried to put in her mouth." Y. "pointed to the front groin area of the doll." Richards asked the mother to "have her daughter point to the areas on the doll that hurt and she pointed to the front groin area of the doll and she pointed to the rear buttocks area of the doll." At that point, Richards decided that someone with more expertise was needed, and he contacted his sergeant.

Santa Cruz Police Sergeant Jack McPhillips was the on-call detective, and he arrived at the scene and spoke to Y. and her family as a group to tell them what was going to happen and "build rapport." Y. said something in Spanish that McPhillips did not understand, and he asked Y.'s father what she had said. The father told McPhillips that Y. had said "'I kill him.'" While she was saying that, Y. had her mouth open and was pointing to it.

Y. was taken to the hospital where she was interviewed and examined by Dr. Lorraine Rao. McPhillips and Y.'s brother were present during the interview. McPhillips had asked Y.'s brother to be present to translate for him because McPhillips did not understand Spanish. Rao understood Spanish. Rao asked Y. if she had been "kissed," and Y. pointed to her mouth and to her "vaginal area."[3] Rao's physical examination of Y. found no evidence of trauma. Y. did not indicate to Rao that anything had been put in her mouth.

Defendant, who lived in an apartment building less than 100 yards from Y.'s home, left town a day or two after the incident. Defendant's fingerprint was found on a

---

[3] Rao explained that she interpreted this indication as "oral copulation" because "when you kiss in the area of the vulva or vagina that is an attempt to oral copulation." "To me it's synonymous. The genital kissing, it's synonymous with attempted oral copulation."

piece of paper inside the leather jacket found in Y.'s bedroom. In 2006, a Santa Cruz police officer learned that defendant was living under an assumed name. Defendant was arrested soon thereafter. A sample of his DNA was obtained, and it was determined that the wet spot on the carpet in Y.'s bedroom was defendant's sperm.

Y. and her family "never discussed" the incident after it occurred. Her family hoped that "she wouldn't remember" it. In 2007, after defendant's arrest, Y. was interviewed by a Santa Cruz police officer and the prosecutor. She told them that she remembered the events of November 18, 1998. They then read to her a portion of McPhillips's police report recounting her gestures and statements in 1998.

## II. Procedural Background

Defendant was originally charged by information with three counts of lewd conduct, one count of forcible lewd conduct, one count of aggravated sexual assault on a child, and burglary. The information also alleged that the lewd conduct and forcible lewd conduct counts had been committed during the commission of a burglary and with the intent to commit an enumerated sex offense (§ 667.61, subds. (d)(4) & (e)(2)) (the one-strike allegations). None of the lewd conduct counts specified the act upon which it was based. The aggravated sexual assault count specified that it was based on "oral copulation."

His first trial was a court trial. He was convicted of burglary, one of the three lewd conduct counts, the forcible lewd conduct count, and the aggravated sexual assault count, and the one-strike allegations were found true.[4] The first trial court imposed consecutive 25 years to life terms for the lewd conduct and forcible lewd conduct counts.

---

[4] He was acquitted of the other two lewd conduct counts after the prosecutor told the court that these were "alternative" counts.

6

On appeal, this court reversed the judgment due to the erroneous admission at the court trial of defendant's statements to the police. This error was found to be prejudicial as to all of the counts and allegations except for the lewd conduct count. The matter was remanded for retrial on the burglary, forcible lewd conduct, and aggravated sexual assault counts, and the one-strike allegations.

An amended information was thereafter filed charging defendant with lewd conduct (the count on which he remained convicted), burglary, aggravated sexual assault on a child by "oral copulation," and forcible lewd conduct by "penis to mouth oral copulation," and alleging the one-strike allegations as to the lewd conduct and forcible lewd conduct counts. The one-strike allegations attached to the lewd conduct count were bifurcated at defendant's request.

The prosecution introduced evidence at trial of uncharged acts under Evidence Code sections 1101, subdivision (b) and 1108. In 1995, defendant entered a home and attacked a 13-year-old girl in her bed. He was convicted of burglary in Washington state for that offense. In 2006, defendant was convicted in Oregon of kidnapping a seven-year-old girl and of sexual abuse for touching the vagina of a five-year-old girl.

The defense conceded in its opening statement that defendant had been in Y.'s home on November 18, 1998. The only defense witness at trial was Dr. Lee Coleman, a psychiatrist, who testified on the subject of "cognitive development of children which relates to their ability to perceive, recall and recollect at various stages of their development and factors which can affect memory of children."[5] Coleman testified that three-year-old children lack "the ability to hold onto experiences" for more than a month or two and cannot "[g]enerally" develop lasting memories. A traumatic event may be remembered for a somewhat longer time, but not for more than a few months. Thus, in

---

[5] The defense also briefly recalled prosecution witness Rao.

7

his opinion, "generally" a three-year-old "would have no memory of the event regardless of how traumatic in later years." Coleman also testified that the type of questioning to which Y. was subjected on November 18, 1998 was so leading and suggestive that her responses were unreliable. Furthermore, Coleman opined that the reliance of witnesses on police reports recounting her 1998 responses was improper because police reports are unreliable records. Finally, Coleman testified that reading a portion of the police report to Y. in 2007 had destroyed the reliability of any memories she claimed to have from the 1998 incident. The defense conceded in closing argument that defendant was guilty of first degree burglary. Defendant's trial counsel argued that defendant was a thief and that his semen could have been from masturbation.

The jury found defendant guilty of the burglary and aggravated sexual assault counts, but it deadlocked on the forcible lewd conduct count. The court declared a mistrial on the forcible lewd conduct count. After a bifurcated trial on the one-strike allegations attached to the lewd conduct count, the jury found the allegations true.

Defendant entered a no contest plea to the forcible lewd conduct count and admitted the section 667.61, subdivision (d)(4) one-strike allegation attached to it in response to the trial court's "indicated sentence" for that count of a consecutive six-year term. The court sentenced defendant to 25 years to life for the lewd conduct count and a consecutive term of 15 years to life for the aggravated sexual assault count. The court also imposed and stayed a "concurrent" term of 25 years to life for the forcible lewd conduct count. The court imposed and stayed under section 654 the upper term for the burglary count. Defendant timely filed a notice of appeal. He also obtained a certificate of probable cause.

8

### III. Discussion

### A. Voir Dire

Defendant contends that the trial court prejudicially erred by unduly restricting voir dire.

### 1. Background

Jury selection began on March 9, 2011, and the jury was sworn on March 15. Early on, after the court had dealt with hardship requests and some for-cause excusals, defendant's trial counsel asked "if the Court would cover 1108" in its voir dire. She suggested: "We should ask them about child molest and . . . you can tell them they are going to receive information that he has been convicted of burglary in the past and ask them how they feel about that then move to the, you know, the conviction for child molest in the past." Following some discussion, the court said: "I would feel a little more comfortable leaving it to you to formulate these questions because you know better than I how ultimately you're going to deal with this. Is there some reason why you think it would be more appropriate for the Court to put these questions to them about the prior and post convictions?" She responded: "I just worry about that I'm going to burn through my time really quickly with these people." The court said that it would "play this by ear."

During defendant's trial counsel's voir dire of the first group of prospective jurors, she told them that defendant had 2006 convictions for "kidnapping" and "sexual abuse" and asked them for their thoughts about the impact of those convictions. After hearing some of their thoughts, she asked: "How would it affect your decision making process if the sexual abuse -- if it was of a child in the past case." The prosecutor objected that she was "asking for a prejudging," and the court sustained the objection. The defense did not further pursue the subject. During her voir dire of subsequent groups of prospective jurors, she described the prior convictions as "burglary," "kidnapping" and "sexual assault" or "sexual abuse" without further details. One prospective juror responded to

9

defendant's trial counsel's inquiry regarding the prior convictions: "He is guilty in my mind when I hear what he's done to children . . . ." Defendant's trial counsel asked another prospective alternate juror: "Any problem with the prior convictions you've heard of for burglary, kidnapping . . . and sexual abuse? Your child is 13."

### 2. Analysis

Trial courts have a great deal of discretion in determining the scope of voir dire in a criminal case and may restrict voir dire that is "not in aid of the exercise of challenges for cause . . . ." (Code Civ. Proc., § 223; *People v. Williams* (2006) 40 Cal.4th 287, 307.) "An appellate court applies the abuse of discretion standard of review to a trial court's conduct of the voir dire of prospective jurors. (See Code Civ. Proc., § 223.) A trial court abuses its discretion when its ruling ' "fall[s] 'outside the bounds of reason.' " ' " (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

Defendant contends that "[t]he trial court refused to permit defense counsel to ask prospective jurors whether their *capacity to fairly try the case would be affected*, if they knew appellant's prior sex offenses involved children." (Italics added.) The record does not reflect that the trial court took any such action.

When defendant's trial counsel asked the trial court to cover the issue of "the conviction for child molest in the past," the court suggested that counsel cover that issue during their voir dire of the prospective jurors. The court's response to this request did not in any way restrict defendant's trial counsel's voir dire of the prospective jurors so it was not an abuse of discretion.

The only other action that the trial court took in this regard was its sustaining of the prosecutor's "prejudging" objection to a single question asked by defendant's trial counsel during voir dire. That question asked: "How would it affect your decision making process if the sexual abuse -- if it was of a child in the past case." The prosecutor's sustained objection was on the ground that the question was "asking for a prejudging."

10

The trial court's ruling was well within its discretion. "Counsel may not use voir dire to instruct the jury in matters of law, to educate jurors about the facts of the case or to compel them to commit themselves to vote a certain way." (*People v. Price* (1991) 1 Cal.4th 324, 449.) Where a trial court could reasonably conclude that a question asks a prospective juror to prejudge an issue in the case, the court does not abuse its discretion in sustaining an objection to that question. (*People v. Friend* (2009) 47 Cal.4th 1, 60.)

Here, the trial court could have reasonably concluded that defendant's trial counsel's question asked the prospective juror to prejudge the impact that defendant's prior conviction for sexual abuse of a child would have on his or her "decision." Since the trial court had already ruled that this conviction was going to be admitted for a broad array of purposes, including defendant's propensity to commit sex offenses, this question asked the prospective juror to commit in advance to a particular position on the impact of that conviction. That is improper. Defendant's appellate claim that his trial counsel sought to ask the prospective jurors "if they could remain fair and impartial if they learned appellant's prior sex abuse conviction involved children" is unsupported by the record. The sustained objection was to no such question. The defense made no attempt to rephrase its question to avoid seeking a prejudgment. While defendant's prior conviction for sexual abuse of a child was a potential source of bias and therefore a proper subject for voir dire, the trial court's sustaining of the prosecutor's "prejudging" objection to this one question did not preclude the defense from exploring the bias issue. While the defense did not explicitly tell the prospective jurors that the prior sexual abuse conviction involved a child, defendant's trial counsel's questions suggested as much, and the record contains indications that the prospective jurors understood that this was probably the case. We find no abuse of discretion in the trial court's sustaining of the prosecutor's "prejudging" objection to this one question.

11

## B. Substantial Evidence

Defendant contends that the jury's verdict on the aggravated sexual assault count is not supported by substantial evidence of force.

An element of the aggravated sexual assault count was that "the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ." (§§ 269, 288a, subd. (c)(2).) The amended information specified that the aggravated sexual assault count was based on oral copulation, but it did not specify whether it was based on penis-to-mouth oral copulation or on mouth-to-vagina oral copulation.

The force element involved here was the same as the force element of forcible rape. "In considering defendant's claim of insufficiency of the evidence of force necessary to affirm his conviction of forcible rape, we must determine only whether, on the record as a whole, any rational trier of fact could find him guilty beyond a reasonable doubt. [Citation.] We view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1028 (*Griffin*).)

"[I]n a forcible rape prosecution the jury determines whether the use of force served to overcome the will of the victim to thwart or resist the attack, *not* whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker. The Legislature has never sought to circumscribe the nature or type of forcible conduct that will support a conviction of forcible rape, and indeed, the rape case law suggests that even conduct which might normally attend sexual intercourse, when engaged in with force sufficient to overcome the victim's will, can support a forcible rape conviction. [Citation.] Nor has the rape law ever sought to quantify the amount of force necessary to establish the crime of forcible rape . . . ." (*Griffin*, *supra*, 33 Cal.4th at pp. 1027-1028.)

Y.'s testimony at trial easily established that the penis-to-mouth oral copulation was accomplished by force. She testified that defendant was either "holding my arm" or "my head" with his hands as he "was like forcing" his penis in her mouth. Although she "tried to pull away," "[h]e was too strong," and her attempts to pull away were unsuccessful. This testimony established that defendant had accomplished the penis-to-mouth oral copulation by a "use of force [that] served to overcome the will of the victim to thwart or resist the attack." (*Griffin*, *supra*, 31 Cal.4th at p. 1027.)

Defendant does not argue that there was insufficient evidence that the *penis-to-mouth* oral copulation was accomplished by force. His argument is that the record establishes that the aggravated sexual assault count was based solely on *mouth-to-vagina* oral copulation. Defendant premises this argument on the fact that the trial court asserted at sentencing that the prosecutor's opening statement and closing argument had based this count on mouth-to-vagina oral copulation. He also suggests, in a footnote, that the jury "understood" the aggravated sexual assault count to be based on mouth-to-vagina oral copulation because it "could not reach a verdict" on the forcible lewd conduct count, which was expressly premised on penis-to-mouth oral copulation.

Defendant's premises are invalid. The trial court's post-verdict remarks themselves have nothing to do with whether sufficient evidence supports the jury's verdict. More importantly, those remarks were inaccurate. After filing the amended information, the prosecutor explained that the forcible lewd conduct count "specifically alleged . . . penis-to-mouth oral copulation, because I -- because, of course, one of the things we need to be clear about is that the [lewd conduct count] represents different conduct than the [forcible lewd conduct count], and it's, basically, the same conduct

13

underlying the [aggravated sexual assault count]."[6] In his opening statement, the prosecutor briefly mentioned the fact that Y. had indicated that the man had put his mouth on her vaginal area. However, when the prosecutor described the "three crimes" that defendant was charged with, he did not premise any of them explicitly on mouth-to-vagina contact. The first crime was "burglary." The second crime he called "committing a lewd act upon a child" and described as "unlawful touching sexually related." The third crime he described as "lewd act specifically oral copulation, putting his penis in her mouth." None of his remarks in opening statement specifically premised the aggravated sexual assault count on mouth-to-vagina oral copulation.

At the instruction conference, the prosecutor asserted that the previously upheld lewd conduct conviction was for "[m]outh to vagina oral copulation." He initially said that he would be "only arguing that -- penis to mouth of the child" in support of both the forcible lewd conduct count and the aggravated sexual assault count. A little later, he said "I'm arguing that penis to mouth touching is what underlies Count 3 [the forcible lewd conduct count]." When defendant's trial counsel suggested that the instruction for the aggravated sexual assault count specify penis-to-mouth contact, the prosecutor said "I need to consider that," and they agreed to come back to the issue. At the end of the instruction conference, the prosecutor stated: "[O]n the issue of Count 2 [the aggravated sexual assault count], the forced oral copulation . . . *I do intend to argue **both** forms of oral copulation*." (Italics & boldface added.) The court noted that he could do so because count 2, unlike count 3, did not specify the type of oral copulation upon which it was premised. Defendant's trial counsel argued that this was improper because

---

[6] At the conclusion of the original trial, Judge Almquist premised the lewd conduct count, the only count that survived the appeal, on defendant's "oral copulation of the victim's vagina."

14

defendant's existing lewd conduct conviction was based on mouth-to-vagina oral copulation, but the trial court did not restrict the prosecutor's argument in this respect.

The jury instructions also did not restrict the aggravated sexual assault count to mouth-to-vagina oral copulation. The instructions required proof of oral copulation, which they defined as "any contact no matter how slight between the mouth of one person and the sexual organ or anus of another person."

The prosecutor argued to the jury that the aggravated sexual assault count could be based on either type of oral copulation. "It's oral copulation. Legally that means any touching of the mouth to genitals whether it be penis to mouth or whether it be vagina to mouth." "Count 2 [the aggravated sexual assault count] is oral copulation mouth to vagina or penis to mouth accomplished by force on a three year old." The defense argument to the jury acknowledged that the aggravated sexual assault count "is not specific. So this is penis to mouth or mouth to vagina. Either way."

As this chronology demonstrates, the prosecutor never expressly premised the aggravated sexual assault count on mouth-to-vagina oral copulation. The information, the amended information, the prosecutor's opening statement, the prosecutor's statements at the instruction conference, the prosecutor's closing argument, and the defense closing argument all left open for the jury to decide which of the two types of oral copulation formed the basis for the aggravated sexual assault count. Hence, the jury was free to premise the aggravated sexual assault count on penis-to-mouth oral copulation. Since there was sufficient evidence that the penis-to-mouth oral copulation was accomplished by means of force, defendant's challenge to the sufficiency of the evidence fails.

We reject defendant's suggestion that the jury's deadlock on the forcible lewd conduct count, which was expressly premised on penis-to-mouth oral copulation, means that the jury could not have unanimously based the aggravated sexual assault count on penis-to-mouth oral copulation. One of the distinctions between the elements of the aggravated sexual assault count and the elements of the forcible lewd conduct count was

15

the nature of the force required. The jury was told that the force required for the aggravated sexual assault count was "enough physical force to overcome the other person's will." In contrast, the jury was told that the force required for the forcible lewd conduct count was force "substantially different from or substantially greater than the force needed to accomplish the act itself." The defense argument to the jury pointed out the difference in the force elements of the two counts. "And for count 2, force is an act accomplished by force if a person uses enough force to overcome the person's will." "[F]orce for Count 3 is great. It must be substantially greater tha[n] required to do the act."[7] Hence, it cannot be presumed that the jury's deadlock on the forcible lewd act count was based on a disagreement about whether the act of penis-to-mouth oral copulation occurred. Instead, the jury's deadlock appears most likely to have arisen from a disagreement about whether the force used was the type of force necessary to support a conviction for forcible lewd conduct.

Since substantial evidence supports the jury's verdict on the aggravated sexual assault count based on the act of penis-to-mouth oral copulation, we need not consider whether there was also substantial evidence that the mouth-to-vagina oral copulation was accomplished by force.[8]

_____

[7] The prosecutor in his closing argument responded to this. "Now, the defense has said you can't find force here [on count 3] because the force has to be substantially greater than that inherent in the act. . . . Not quite right. For the forcible lewd act, the force must be substantially different from or substantially greater than the force needed."

[8] Y. did not testify at trial about the mouth-to-vagina oral copulation. The only evidence of the mouth-to-vagina oral copulation consisted of Y.'s gestures in response to questions from Richards and Rao on the night of the incident. Richards had Y.'s mother ask Y. to "point to the areas on the doll that hurt," and Y. "pointed to the front groin area of the doll . . . ." Rao asked Y. if she had been "kissed," and Y. pointed to her mouth and to her "vaginal area." Rao asked Y. if she had any pain, and Y. pointed to her vulva, the area in front of her vaginal area. Y. indicated that the man had "touched her with his mouth, his lips, and she pointed to two areas where she had been touched by his lips." (*continued*)

### C. Admissibility of McPhillips's Testimony About Y's 1998 Statements

Defendant contends that McPhillips's testimony about statements made by Y. in 1998 that were translated by her brother was inadmissible because the brother's translation was unreliable.

### 1. Background

Defendant made an in limine motion prior to the first trial seeking a determination of Y.'s competency and of the admissibility of her prior statements. This motion did not challenge the use of her brother as an interpreter in 1998. A similar motion in limine was brought prior to the second trial. It too did not challenge the use of Y.'s brother as a translator.

The prosecutor sought an in limine ruling on the admissibility of Y.'s 1998 statements and gestures. The defense responded that Y.'s statements and gestures that "were interpreted and perceived by others" were inadmissible hearsay and testimonial hearsay that would violate the confrontation clause. Defendant argued that Y.'s "interpreted" statements and gestures were inadmissible under Evidence Code section 1253 because they lacked the requisite reliability and trustworthiness.

At the hearing on the in limine motions, the court noted that Y.'s statements were "articulated to Detective McPhillips by way of Spanish to English translation from [the brother] and so I imagine there's a foundational issue here. [The brother] would first have to testify on what was said to him in Spanish by his sister; right?" Defendant's trial counsel responded: "Right." She contended: "[T]he foundational problems are quite obvious and it's sort of subject to -- all of these statements are subject to the interpretation of the brother and what he believed he was using as the language." The

---

These two areas were her mouth and her vaginal area. Thus, although Y. indicated that her vaginal area hurt, she provided no indication of how the mouth-to-vagina oral copulation had occurred.

17

court tentatively ruled that Y.'s statements "through the interpreter" were admissible under Evidence Code section 1253.

The court thereafter held an in limine hearing at which Rao testified. Rao had reviewed her examination record and McPhillips's police report. Rao denied that Y.'s brother had acted as "an interpreter in the sense of telling me words I didn't know the meaning of," but she explained that "at times she may have looked to him or said something to him and he may have repeated what she said." When Y. was asked "what had happened," she opened her mouth and pointed to her mouth. This was her response to at least three questions. Once, Y. responded "senor cali pago," which Rao understood to be nonsense. Rao asked Y. if she had any pain, and Y. pointed to her vulva, the area in front of her vaginal area. Y. indicated that the man had "touched her with his mouth, his lips, and she pointed to two areas where she had been touched by his lips." These two areas were her mouth and her vaginal area. Rao was asked if she had relied on Y.'s brother "to tell you what his sister meant or what she said," and Rao responded "I don't recall having to rely on him being the interpreter for me." "I was able to understand what she was saying and the terms she was using." "Her answers were mainly nonverbal." Y. was "very bright," "seemed to know what we were asking," and answered in "a mixture of two languages . . . ." Rao did all of the questioning because she was the one with "rapport" with the child.

McPhillips testified at the in limine hearing that, when he was introducing himself to the family, Y. opened her mouth, pointed to it, and said something in Spanish. Since McPhillips did not understand Spanish, he asked Y.'s father what she had said. Y.'s father said that Y. had said "I kill him." When they arrived at the hospital, McPhillips decided to use Y.'s brother as a translator during Rao's interview of Y. because there were no Spanish speaking officers available and it would not be appropriate to use a parent. McPhillips relied on Y.'s brother's translation because he did not understand Spanish.

18

The court asked the prosecutor: "Are you offering Sergeant McPhillips to testify to any statements or gestures made by Y[.] during the S.A.R.T exam that are not going to be testified to by Dr. Rao?" The prosecutor responded: "No. It would be duplicative in what Dr. Rao is going to say." The court noted that Rao had testified that she "was not relying on the eight-year-old brother for her understanding of the words that she attributed to the child. . . . I'm not seeing why Sergeant McPhillips is necessary for anything concerning statements made during the course of the S.A.R.T. exam since all of those are going to be covered by Dr. Rao." The court asked defendant's trial counsel: "Do you disagree with that?" She responded: "No, Your Honor. I don't disagree with that and with the Court's ruling I will not ask Mr. -- Sergeant McPhillips any questions."

Defendant's trial counsel continued to object to Rao's testimony on confrontation clause grounds. She did not argue that Rao's testimony was unreliable. The court found that Rao's testimony about Y.'s statements and gestures came within the hearsay exception in Evidence Code section 1253. It ruled that there was no confrontation clause problem because both Y. and Rao were available for cross-examination.

Y.'s brother testified at trial that he did not know "exactly what happened" on November 18, 1998 as he was asleep during the incident. He remembered going to the hospital and translating what Y. said. The brother's first language was Spanish, and he was fluent in Spanish at that time. He spoke both Spanish and English to Y. at that time. The brother was able to communicate with Y. and translate what she said. He could no longer remember what she had said, but he recalled that he had accurately translated what Y. said. For many years after the incident, the incident was not discussed at all. When Y. was a teenager, she told her brother "basic parts of what happened" after she began having nightmares. She never provided details. The brother did not know the details of what happened that night. The brother never brought it up because he "didn't want my sister to have to go through that."

19

Rao, a pediatrician, testified at trial that she had a lot of experience communicating with three-year-old children and about 50 percent of her patients spoke Spanish. She had examined Y. on November 18, 1998 after talking to Y.'s mother, who told Rao that she thought Y. had been "sexually touched." Rao recalled that Y. was "a bright child" who "was bilingual at a fairly early age." Although Rao could not speak Spanish fluently, she understood "basic medical Spanish well . . . ." She could understand what Y. was communicating to her. "[S]he not only said a few words but she also used pretty graphic actions as she was speaking or instead of speaking." The prosecutor asked: "Was an eight-year-old brother used to do some translating or interpretation?" Rao responded: "To be honest I didn't use him for a translator . . . ." "I don't recall using him as a translator because I understood what the little child was saying." Rao had no difficulty understanding Y. Y. was speaking "a combination" of Spanish and English, and "she might start a sentence and then after two words trade off from one language to another because to her she is just following her thoughts." "She's only speaking short sentences, three, four words at a time usually," so Rao could understand her. Having her brother with her "seemed to reassure her." Her brother did no "prompting." The only thing that Rao did not understand was when Y. said "senor cali pago." While Y. was saying these words, she pointed to her vaginal area. Rao testified that Y. did not indicate that anything had been put in her mouth.

After Rao's testimony, the prosecution sought to have McPhillips testify regarding Y.'s gestures and statements during Rao's interview, and the court ruled that McPhillips would be permitted to testify to any "observation in addition to or separate and distinct from Dr. Rao . . . ." Defendant's trial counsel interposed a confrontation clause objection, but the court overruled it. She renewed her objection during McPhillips's testimony, and it was again overruled.

McPhillips testified that, because he did not understand Spanish, he decided to have the brother present during the interview of Y. "to translate for her." When Y. was

20

asked what happened, she opened her mouth, pointed to it, and said "the man" in Spanish. McPhillips testified that most of Y.'s verbal responses were in Spanish and were translated by her brother. Y. was asked what words she used for various body parts, and she responded that she used "[m]anos" for hands, "[l]abios" for lips, "[b]irdy" for vagina, and "[p]ajarito" for penis. Y. gestured that the man had touched her lips, vagina, and "butt" with his hands. She indicated that the man's lips had touched her lips, her earlobe, and her vagina. Y. also indicated that she had seen the man's penis. On cross-examination, McPhillips testified that he depended on the brother to translate, but he knew that Rao spoke and understood Spanish.

Rao thereafter testified that the word pajarito means "little bird" and "usually refers to the penis." Y. used the word pajarito to refer to a penis and the word birdie in English to refer to her vagina. These were common usages of these words.

## 2. Analysis

Defendant claims that the trial court prejudicially erred in permitting McPhillips to testify about statements Y. made in Spanish that were translated for him by Y.'s brother. The Attorney General contends that defendant forfeited this contention. Defendant maintains that he "apprised the court of the issue and preserved it for appeal" because his trial counsel "cited the fact the translation was being provided by [the brother] as a reason to find the hearsay to be unreliable." He cites one page of the clerk's transcript and two pages of the reporter's transcript in support of his claim that this contention was preserved below. We find that the contention has been forfeited.

The clerk's transcript citation is to defendant's trial counsel's response to the prosecutor's request for an in limine ruling on the admissibility of Y.'s 1998 statements and gestures. She sought an Evidence Code section 402 hearing on the admissibility of this evidence and contended that Y.'s statements and gestures were unreliable because Y.'s brother had interpreted "to Dr. Roa [*sic*]." The response did not mention Y.'s brother interpreting for McPhillips. At the hearing on the prosecution's in limine motion,

21

the court noted that this motion sought admission of "evidence of Y[.]'s behavior in the presence of" McPhillips, Rao and Y.'s brother. The court noted that, "as it relat[es] to Detective McPhillips . . . here's the problem with the statement is that it's articulated to Detective McPhillips by way of Spanish to English translation from [the brother] and so I imagine there's a foundation issue here. [The brother] would first have to testify on what was said to him in Spanish by his sister; right?" Both the prosecutor and defense counsel agreed, but the prosecutor said "that doesn't preclude Detective McPhillips from saying what he observed by pointing to her mouth with her mouth open." Defendant's trial counsel told the court: "[T]he foundational problems are quite obvious and it's sort of subject to -- all of these statements are subject to the interpretation of the brother and what he believed he was using as the language." Defendant's trial counsel complained that "they're getting redundant statements and they're getting too many witnesses to be able to create a foundation to get in any of these statements and they don't have probative value. The problem is it becomes misleading and it becomes time consuming." She said nothing more about the issue of the brother's interpretation. After they had discussed some other issues, the court announced its "tentative" rulings. With regard to the prosecutor's motion "concerning admission of evidence of Y[.]'s statements to Dr. Rao, my sense is that this would be covered by Evidence Code section 1250 and these statements would be admissible because they're made by a sexual assault victim under age 12 and in the course of a medical exam for purposes of diagnosing treatment. My concern -- is Dr. Rao a Spanish speaker? How are -- how is she getting the information?" Defendant's trial counsel responded: "From the eight-year-old brother, so then they've got the foundational issue of having the brother come in and testify . . . ." The court asked the prosecutor if he intended to "elicit through Dr. Rao" Y.'s statements at the hospital. The prosecutor said "Yes." He said: "[W]e will all find out when she testifies how much Spanish she understands. My -- what I inferred from what she told me is that she does understand some Spanish."

22

Defendant's trial counsel then interjected: "And, Your Honor, I would ask for a 403 hearing on this because I don't believe those were the child's statements . . . ." She asserted that Rao's report was actually based on Y.'s mother's statements. The court agreed to hold an Evidence Code section 402 hearing at which Rao would testify "to determine what was said to her by whom and what language established that and then determine the admissibility based upon the foundation that's show in the 402 hearing . . . ." "I do believe to the extent that it can be established that the child reported these things, albeit through the interpreter or partially in Spanish or partially in English, are that they would be admissible pursuant to Evidence Code Section 1253."

At the Evidence Code section 402 hearing, Rao denied that Y.'s brother had acted as "an interpreter in the sense of telling me words I didn't know the meaning of." McPhillips testified at the hearing that he relied on Y.'s brother's translation because he did not understand Spanish. The prosecutor told the court that he would not be having McPhillips testify about Y.'s statements and gestures during Rao's interview because "[i]t would be duplicative in what Dr. Rao is going to say." The court noted that Rao had testified that she "was not relying on the eight-year-old brother for her understanding of the words that she attributed to the child. . . . I'm not seeing why Sergeant McPhillips is necessary for anything concerning statements made during the course of the S.A.R.T. exam since all of those are going to be covered by Dr. Rao." The court asked defendant's trial counsel: "Do you disagree with that?" She responded: "No, Your Honor. I don't disagree with that and with the Court's ruling I will not ask Mr. -- Sergeant McPhillips any questions."

When, after Rao's testimony, the prosecution sought to have McPhillips testify regarding Y.'s gestures and statements during Rao's interview, the only objection raised by defendant's trial counsel was a confrontation clause objection, which the court overruled. Defendant's trial counsel never objected to McPhillips's testimony on the

ground that Y.'s brother's translation was unreliable, and she never obtained a ruling from the trial court on such an objection.

"[A] motion in limine to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context. When such a motion is made and denied, the issue is preserved for appeal. On the other hand, if a motion in limine does not satisfy each of these requirements, a proper objection satisfying Evidence Code section 353 must be made to preserve the evidentiary issue for appeal." (*People v. Morris* (1991) 53 Cal.3d 152, 190, italics omitted, disapproved on a different point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

The arguments made by defendant's trial counsel did not satisfy these requirements. She never identified McPhillips's testimony about Y.'s statements as the evidence she sought to exclude based on the brother's translation. Her in limine arguments were directed solely at *Rao's* testimony about Y.'s statements. Defendant's trial counsel chose not to question McPhillips at the Evidence Code section 402 hearing because the prosecutor did not at that time plan to have McPhillips testify regarding Y.'s statements. When the prosecutor changed his mind at trial, defendant's trial counsel interposed a confrontation clause objection but did not challenge the admissibility of McPhillips's testimony about Y.'s statements on the ground that the statements had been interpreted by her brother. Hence, the trial court was never asked to rule on the admissibility of *this evidence* over an objection on *this ground* and never ruled on this point. Under these circumstances, defendant plainly failed to preserve this issue for appellate review.

24

### D. Admissibility of Y's Trial Testimony

Defendant claims on appeal that the trial court was required, as a matter of due process, to exclude Y.'s trial testimony as "fundamentally unreliable" because Y.'s memory had been "tainted" by "suggestive interview techniques." He maintains that, had the court excluded Y.'s trial testimony, it also would have been required to exclude her 1998 statements and gestures due to the absence of an opportunity for confrontation.

### 1. Background

Defendant filed a written in limine motion challenging Y.'s competency to testify as a witness at trial. He claimed that Y. lacked personal knowledge of these events because (1) she did not have the "mental capacity to perceive, recollect and recount events accurately" that occurred when she was three years old, and (2) her recollections were based on "hearing family members discuss the matter" and "suggestive interview techniques" utilized by the police and the prosecutor.

The trial court held an evidentiary hearing on defendant's challenge to Y.'s competency and personal knowledge. The court noted that this hearing was a "very limited inquiry here as to whether there is sufficient evidence for a preliminary fact that she has present recollection of the events . . . ." Defendant's trial counsel did not challenge the court's characterization of the narrow scope of the hearing.

Y. testified at the hearing that she remembered "the things that happened" to her "that night" in 1998 when she was three years old. She was "sure" that her memories were "not the product of something someone else" had told her. At the prosecutor's request, the court also considered testimony at the preliminary examination indicating that Y. had recalled the 1998 events during the 2007 interview.

Defendant asked the court to also consider Coleman's testimony at the prior trial in ruling on this motion. The court agreed to take judicial notice of a portion of Coleman's testimony at the prior trial, but the court limited the scope of this evidence: "The only relevant evidence in this transcript [of Coleman's testimony at the prior trial]

25

as it relates to this proceeding is Dr. Coleman's opinion given the brain development of a 36-month-old child whether the child in that situation has the ability to recall . . . ten years later about events that occurred when she was 36 month old."[9]  Defendant's trial counsel did not object to the court's limitation on the portion of Coleman's prior testimony that it was considering, and she did not seek to present testimony from Coleman or any other evidence at the hearing.

The portion of Coleman's prior testimony that court considered consisted of Coleman's testimony that the "earliest age" at which he "would expect a child to be able to form lasting memories" was three and a half to four years old.  He claimed that this was "generally what the field believes" and that the "consensus of the research in the field" was that a three-year-old child "would be unable to form these lasting memories."  Coleman opined that a three-year-old child would not be able to "hold" a memory for more than two months.

The court found that Y.'s testimony at this hearing provided "a sufficient basis for a reasonable jury" to decide whether she "does recall what she testified happened to her and that that information is derived from her own senses or is derived from suggestions

---

[9]  Coleman had also testified at the prior trial that three-year-old children are "very vulnerable to having their memory and recollection . . . influenced about what they've seen by any outside influences."  He opined that the police had used "suggestive and leading techniques" in questioning Y. in 1998 "which I feel makes it virtually certain that from the very beginning outsiders were influencing any chance the child would have of just relying on her own perceptions in describing what just happened."  He also maintained that "to the extent that the family continues to keep the events of that evening in the forefront and to the extent that the family, you know, would communicate to the child, verbally or nonverbally, that there's danger and that she was a victim and all that kind of scary stuff, you run a very grave risk that the child will elaborate in her own thinking about what happened that night, and it would be very likely that the child would begin to picture that night in ways which would contaminate the actual event."  He also testified that the 2007 interview of Y. had influenced her to believe that she could remember what she was told had happened.

made to her by others and that's a matter for the jury to determine." At no point during this hearing or at any other time did defendant's trial counsel interpose a due process objection to Y.'s testimony or argue that her testimony would be fundamentally unreliable. Defendant's trial counsel did not renew or supplement her motion to exclude Y.'s testimony in advance of Y.'s trial testimony.

Y. testified at trial that she remembered the 1998 incident when she was three years old. "I remember me being on my knees with a man in front of me with their pants down and his hands were -- I don't remember if he was holding my arms or by my head but he put his thing inside of my mouth and from there I tried to pull away but I couldn't. He was too strong and I guess finally pulled away and I gagged and I screamed and I see my mom coming in and he ran in the closet I think and as she came in he ran out and I seen my dad go run after and then I just heard a gunshot and that's it." She remembered nothing else about that night.

Y. testified that she had never talked about the incident with her family because "I don't like talking about it." Her trial testimony was the first time she could remember being asked to recall the incident. A year or two prior to her trial testimony, Y. had told one of her friends about the incident after her friend had told her that she "went through the same thing." Y. did not recall being interviewed by the prosecutor in 2007 or being questioned by the police or the doctor on the night of the incident. Y. had not reviewed any recordings, police reports, transcripts of interviews, or "anything like that" before coming to court to testify.

Coleman testified at trial that the ability of three-year-old children to observe, perceive, and communicate is "pretty good," but "they are extremely fragile, you might say vulnerable in terms of reliability or ability to tell somebody in a comprehensive way with language -- language development and the ability to hold onto experiences and describe it later on is still in the very early stages of formation." He asserted that "[g]enerally" a three-year-old cannot develop lasting memories. "Most children would

27

not have any memories from three and a half. Four years old is a little more likely, three and a half very infrequent." Coleman opined that a three-year-old would not be able to hold a memory for more than a month or two. A traumatic event may be remembered for a longer time, but not for more than a few months. A four-year-old, on the other hand, could hold a memory for the rest of his or her life. Coleman expressed the opinion that "[g]enerally" a three-year-old "would have absolutely no memory of the event regardless of how traumatic in later years." Any memory she claimed to have would be an "influenced belief" rather than a memory.[10] Coleman conceded on cross-examination that other experts in the field believed that children as young as two or three years old could form memories that lasted for years.

## 2. Analysis

Defendant's claim on appeal challenges the admission of Y.'s trial testimony on the ground that it was *fundamentally unreliable*. He contends that the trial court was required to exclude it on *constitutional due process* grounds. We decline to reach this contention because he forfeited it by failing to raise it below.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the

---

[10] Coleman also expressed the opinion that the leading or suggestive questioning to which Y. was subjected shortly after the incident combined with the questioners' belief that "something sexual had been done to the child" created a risk of influencing her responses, thereby damaging their reliability. Coleman also testified that a police report is an unreliable record of an interview. Coleman criticized the use of a family member to translate because a family member is not objective, neutral, and professional. The family member may also repeat the information imparted in the interview to the child and thereby influence the child to believe that the repeated information is an actual memory of the event. In addition, Coleman testified that reading portions of the police report to Y. in 2007 had destroyed the reliability of any memories she claimed to have from the 1998 incident.

evidence that was timely made and so stated as to make clear *the specific ground* of the objection or motion.  [¶]  (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353, italics added.)

Defendant challenged the admissibility of Y.'s testimony, but not on due process grounds and not on the ground that it was fundamentally unreliable.  His trial court objections were limited to competency and personal knowledge, and the evidence upon which he now relies regarding "influences" on Y. was not before the trial court when it ruled on defendant's personal knowledge and competency objections.  Defendant argues that his appellate due process claim is not forfeited because it "rests precisely" on his claims below that Y. lacked competence and personal knowledge.  Not so.  He does not reiterate those claims on appeal and for good reason.  The evidence before the trial court when it rejected defendant's competency and personal knowledge objections plainly supported its findings that Y. was competent to testify at trial and that the jury could conclude that she had personal knowledge of the subject matter of her testimony.  If defendant's appellate due process contention were based on his competency and personal knowledge objections, it would necessarily fail.  If not, he failed to preserve it for appellate review.  In either case, his appellate due process contention cannot succeed.

### E.  Prior Santa Cruz Incident

Defendant claims that the trial court abused its discretion in admitting evidence of a June 1998 incident at Cynthia Gray's home in Santa Cruz (the Gray incident) under Evidence Code sections 1101, subdivision (b) and 1108.  He argues that the erroneous admission of evidence of the Gray incident violated his rights to due process and a fair trial.  Defendant also claims that the trial court erred in overruling his objection to Gray's brief opinion testimony.

29

## 1. Admissibility

### a. Background

The prosecution sought admission of evidence of several uncharged acts, including the Gray incident, under Evidence Code sections 1101, subdivision (b) and 1108. The prosecution claimed that the Gray incident was admissible under Evidence Code section 1101, subdivision (b) to show "intent, common plan and scheme, [and] lack of mistake" and under Evidence Code section 1108 to show defendant's "propensity" because it was a "failed attempt[] to molest children."

Defendant sought exclusion of evidence of the Gray incident. Defendant claimed that this incident was not admissible under Evidence Code section 1108 because it was not a sex offense and was not admissible under Evidence Code section 1101, subdivision (b) because it did not involve a sexual intent. Defendant also contended that the Gray incident was irrelevant because "defendant was never identified as the suspect."[11] The defense urged the court to exclude evidence of the Gray incident under Evidence Code section 352 on the grounds that it had little probative value and would be inflammatory and unduly time-consuming.

At the in limine hearing on the issue, the defense reiterated that Gray had not positively identified defendant as the perpetrator and asserted that the evidence should be excluded under Evidence Code section 352. "I think it's very prejudicial. It has no probative value in this case whatsoever and I think it's going to confuse the jury . . . ." The court ruled that the evidence was admissible.

---

[11] The prosecutor's trial brief stated that Gray had told the police that she was "90 percent sure" that defendant was the intruder.

At trial, the prosecution introduced evidence of defendant's 1995 Washington state residential burglary conviction[12] and defendant's 2006 Oregon convictions for kidnapping a seven-year-old girl and for touching the vagina of a five-year-old girl. It also introduced Gray's testimony and the testimony of sheriff's deputies about the Gray incident. Gray testified that in June 1998 she was awakened at 2:00 a.m. while she was in bed with her five-year-old and seven-year-old daughters in her daughters' bedroom in their home in Santa Cruz. She heard a noise that she thought was her son. She went back to sleep. Gray was again awakened by noise and saw a "person was on their hands and knees looking at me . . . ." This person was "[o]n the floor coming out from underneath the bed." After a few moments, she "realized it was somebody I didn't know that was on their hands and knees in my kids' bedroom . . . ." Gray said to the man: "who are you and what the fuck are you doing in my house." The man fled, and she chased him out of the home. He ran out the back door, which did not lock, into the backyard, and over a fence. There were children's toys in Gray's backyard. The man was wearing blue jeans, a white T-shirt, and a blue plaid flannel shirt. Gray called the sheriff's department.

About an hour later, a deputy spotted defendant, who matched Gray's description, about a half mile from Gray's home. The deputy was in his patrol car at an intersection when he saw defendant running "at full speed" through a liquor store parking lot. Defendant turned the corner and pressed his back up against the wall "to hide" from the deputy. When defendant saw the deputy approaching, he jumped a fence and ran through

---

[12] The victim of the Washington burglary, who had been 13 years old at the time, testified that she awakened in the middle of the night to find defendant holding her down in her bed. She called out for her mother, and defendant told her to be quiet and covered her mouth with his hands. He said he would kill her if she did not cooperate. She began "kicking wildly," and was able to escape his grasp, run out of the room, and awaken her mother, who chased defendant out of the home. Defendant had entered the home through the rear sliding glass door. Nothing had been taken from the home.

31

bushes into a ravine. The deputy called out to him to stop, but he did not. When backup arrived, they continued to call out to defendant. The deputies proceeded into the ravine and found defendant lying face down in a puddle of water. Defendant was detained.

The deputies took Gray to the scene of defendant's detention to see if defendant was the man she had seen in her home. Defendant was "kind of muddy and wet" but otherwise met her description except that he was no longer wearing the flannel shirt. She believed defendant was the man she'd seen in her home and "felt pretty positive but there was a little percent of me that he looked a little bit different. It was dark so I said I'm [90 or] 95 percent sure." Defendant was then arrested.

The jury was instructed that the uncharged offenses could be used to show that defendant "was disposed or inclined to commit sexual offenses and . . . that defendant was likely to commit" the charged offenses. The jury was also instructed that the uncharged offenses could be used to show intent, motive, plan, mistake, or accident. The prosecutor mentioned the Gray incident twice during his opening argument to the jury and twice again during his closing argument.

### b. Analysis

Defendant claims that the trial court should have excluded evidence of the Gray incident because there was inadequate evidence that defendant was the person involved in the Gray incident. Gray identified defendant as the man who had been in her home. While her physical description of the man was not completely consistent with defendant's appearance, her in-person identification of him that night coupled with defendant's suspicious actions when the deputies sought to make contact with him provided sufficient evidence that defendant was man who had been in Gray's home.

Defendant asserts that the Gray incident was inadmissible under Evidence Code section 1108 because there was no evidence that it was a sex offense. Not so. In the middle of the night, defendant entered a home that had children's toys in the backyard. He secreted himself under the bed in the children's bedroom. Gray observed him on his

32

hands and knees looking into her children's bed. These circumstances amply supported a reasonable inference that only Gray's presence had intervened to prevent defendant from attacking her children. The most probable explanation for defendant's middle-of-the-night assault on two little girls in their bed was a sexual intent. The trial court could reasonably conclude that the Gray incident amounted to an attempted lewd act on a child. For the same reasons, we reject defendant's assertion that the Gray incident "did not involve sexual contact nor [*sic*] any clear evidence of such intent." While there was no actual sexual contact, defendant's intent was sufficiently clear.

Defendant makes a series of challenges to the court's admission of evidence of the Gray incident over his Evidence Code section 352 objection. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) On appeal, "[t]his court reviews the admissibility of evidence of prior sex offenses under an abuse of discretion standard. [Citation.] A trial court abuses its discretion when its ruling 'falls outside the bounds of reason.'" (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969 (*Wesson*).)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "The evaluation of the potential for prejudice must consider numerous factors, including '[the prior sex offense's] nature, relevance, and possible remoteness, the degree

33

of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' [Citation.] Other relevant factors include whether the uncharged acts are more inflammatory than the charged conduct, the possibility the jury might confuse the uncharged acts with the charged acts and seek to punish the defendant for the uncharged acts, and the time required to present the evidence of the uncharged acts." (*People v. Daniels* (2009) 176 Cal.App.4th 304, 316-317 (*Daniels*); *People v. Falsetta* (1999) 21 Cal.4th 903, 917.)

Defendant claims that the trial court failed to engage in the requisite balancing under Evidence Code section 352. A trial court applies Evidence Code section 352 by weighing the probative value of the evidence against the potential for undue prejudice from its admission. (*Daniels*, *supra*, 176 Cal.App.4th at p. 316.) "[A]lthough the record must affirmatively show that the trial court weighed prejudice against probative value in admitting evidence of prior bad acts [citations], the trial judge 'need not expressly weigh prejudice against probative value—or even expressly state that he has done so [citation.].' [Citations.] Thus, as the cases reflect, we are willing to infer an implicit weighing by the trial court on the basis of record indications well short of an express statement." (*People v. Padilla* (1995) 11 Cal.4th 891, 924, overruled on a different point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) Such "record indications" include "argument of counsel or comments by the trial court, or both, touching on the issues of prejudice and probative value from which we might infer that the court was aware of the Evidence Code section 352 issue and thus of its duty to weigh probative value against prejudice." (*Padilla*, at p. 924.)

Here, the "record indications" are more than sufficient to demonstrate that the trial court weighed prejudice against probative value. Defendant's trial counsel argued in her written motion and at the hearing on her motion that the probative value of this incident and the others to which she objected was outweighed by prejudice. While the trial court did not expressly mention the weighing process when it ruled on the admissibility of the Gray incident, it explicitly mentioned both Evidence Code section 352 and "undue consumption of time" when, immediately after its ruling on the Gray incident, it ruled in response to the defense's unitary motion challenging the admissibility of uncharged acts that one of the other uncharged acts was inadmissible under Evidence Code section 352. The court also expressly mentioned Evidence Code section 352 moments later when it ruled that defendant's 2006 convictions were admissible: "I've considered this in light of Evidence Code Section 352." We find these "record indications" sufficient to demonstrate that the trial court engaged in the requisite weighing process as to the Gray incident.

Defendant contends that the Gray incident should have been excluded under Evidence Code section 352 as cumulative since there was already "ample evidence of appellant's propensity to commit sex offenses" and of his sexual intent. The Gray incident was not merely cumulative of the other uncharged acts because, unlike the other uncharged acts, the Gray incident occurred just a few months prior to the charged offenses. Its temporal proximity to the charged offenses gave it unique probative value on the issue of defendant's state of mind and propensity at the time of the charged offenses.

Defendant asserts that this evidence should have been excluded under Evidence Code section 352 as unduly time-consuming. Given its unique probative value as to defendant's propensity and intent, the trial court did not abuse its discretion in concluding that this probative value was not substantially outweighed by the risk of prejudice. This

35

was particularly true given that the other uncharged acts were far more egregious than this one. The time consumed was not undue.

As the trial court did not err in admitting evidence of the Gray incident, defendant's related constitutional claims premised on the alleged error also fail. (*People v. Hawkins* (1995) 10 Cal.4th 920, 952, disapproved on a different point in *People v. Lasko* (2000) 23 Cal.4th 101, 110.)

## 2. Gray's Opinion Testimony

Defendant claims that the trial court prejudicially erred in overruling his objection to Gray's testimony that she told the deputies "that I felt that the man was there to do something to my children." The prosecutor asked Gray "what happened" after she called the sheriff's department. She responded: "They came to the house. I told them that he was in the house. They asked a lot of questions. I told them that I felt that the man was there to do something to my children." Defendant's trial counsel objected on grounds of relevance and "[s]peculation" and moved to strike. The court overruled the objection. Gray then continued: "And then I told them -- they told me, ma'am, he was here to rob you. It's okay. And I said it's not okay. If he was here to rob me why was he asleep under the bed." Defendant's trial counsel objected to the "narrative," and the court said "[l]et's wait for the next question." The jury was instructed: "Witnesses who were not testifying as expert, gave their opinions during the trial. You may, but are not required to, accept those opinions as true or correct."

Assuming arguendo that the trial court erred in permitting Gray to testify that she believed that the intruder intended to "do something to my children," we see no significant potential for prejudice. Her testimony on this point was nothing more than her interpretation of the circumstances, and there was no likelihood that the jury would have taken it as anything more than that. Her belief was clearly supported by the evidence, as we have discussed above, and the fact that she was permitted to express it was unlikely to

36

influence any juror who did not believe that these circumstances supported her belief. Consequently, any error was harmless.

### F. Prosecutorial Misconduct

### 1. Background

During in limine motions, the court told defendant's trial counsel: "No claims of prosecutorial misconduct should be made in the presence of the jury. Any assertion of prosecutorial misconduct are [*sic*] to be dealt with by using the phrase objection, request to approach sidebar . . . . No speaking objections are going to be permitted, so I want to know the evidentiary basis of the objection . . . ." Prior to opening statements, the court instructed the jury: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments the attorneys will discuss the case but their remarks are not evidence. Their questions are not evidence. Only the witness' answers are evidence."

Near the beginning of the prosecutor's opening statement, he said: "Ladies and gentlemen, one night when Y[.] was just three years old she was asleep in her own bed safe in her own room, safe in her own house in her own home. Home. Home is where you hang your hat. Home is where the heart is. There's no place like home. There's no place like home. But on that night an intruder entered that house with a terrible reason, with a terrible intent in his mind and he sexually attacked Y[.], shattered her world, turned her upside down and destroyed perhaps forever any feeling of safety or security, innocence lost. Home will never be the same again." Defendant's trial counsel did not interpose any objections to this portion of the prosecutor's opening statement.

Later in his opening statement, the prosecutor pointed out defendant and said: "We know he did it. We know why he did it. We know it was him. We know why. We know it was him." Defendant's trial counsel objected: "I would object to argument at this time." The court overruled the objection. The prosecutor went on. "We know it was

37

him because he left his jacket in the room." He went on to describe the evidence that identified defendant as the intruder. "That's why we know it was him. [¶] Now why? Why did he do it? We know why he did it. We know why he did it because he has an abnormal interest in having sex with very young children. . . . [S]omeone who breaks into a house at night knowing that there's probably people home but being pushed by a compulsion, a propensity, a strong desire--" Defendant's trial counsel again objected to "argument," and this time her objection was sustained. She also requested that the assertion be stricken and the jury admonished. The court responded: "Just go ahead and stick to the evidence. I'll grant the motion to strike the last remark." The prosecutor went on. "We know he did it and we know why because as the court has indicated and counsel has indicated the defendant has prior convictions for similar conduct . . . ." He described the 2006 prior convictions.

The prosecutor then discussed Y.'s family. "I'm not going to identify exactly where they live. Part of the reason why they no longer live in Santa Cruz is because . . . ."[13] Defendant's trial counsel objected and requested that the remark be stricken and the jury admonished. The court sustained the objection but did not strike the remark or admonish the jury. The prosecutor then said that "they left Santa Cruz and moved away because of the horrible memories that Y[.]--" Defendant's trial counsel again objected, but the court overruled the objection.

The prosecutor proceeded to tell the jury that Y.'s brother would be sitting next to Y. when she testified because Y. "is very, very, very upset and afraid of the fact that she has to come in here and testify, . . . [and] terrified to be here and honestly she'll tell you the biggest reason she is terrified is because that man is in this room. That's why she is

---

[13] The prosecutor subsequently elicited testimony from both Y. and her mother precisely identifying their current city of residence.

terrified and she doesn't want him to see her. She doesn't want him to see her face to ever know what she looks like because God forbid if ever something happened and he got out she's afraid he'll come after her. That's how deep . . . her fear is and that goes directly to her credibility when she testifies." Defendant's trial counsel objected and asked to approach, but the court told her not to and simply directed the jury to "[d]isregard anything about Y[.]'s future f[ears]." A short time later, defendant's trial counsel again objected and complained that the prosecutor "is talking about punishment. I think we're at the point where this is prejudicing our jury and I am asking for a mistrial." The court overruled her objection and said that she could make "a record at a later time." The prosecutor reiterated his theme: "[S]he is terrified and she's scared. . . . [S]he just can't even stand the idea of being in the same room as the person who did this to her, who shattered her feeling of security and safety and who she's still afraid of today."

Immediately after the prosecutor's opening statement, the court admonished the jury: "Ladies and gentlemen, I just want to remind you -- just to clarify an objection and my response to the objection, nothing that the attorneys say is evidence. You alone must decide what the facts are and you alone must decide the credibility and believability of the witnesses and you must not in any manner consider punishment in reaching your verdict in the case."

Defendant's trial counsel requested the opportunity to make a record outside the presence of the jury, and the court granted her request. She stated: "I know that the court had requested I do not assign my objections as prosecutorial misconduct, however -- in front of the jury which I did not, however, I will assign the following as misconduct in Mr. Sherman's opening. He personally was vouching for defendant's guilt. He was personally vouching for Y[.'s] credibility as a witness. He was discussing punishment. He made the statement God forbid --- God forbid he ever[] gets out. [¶] And, Your

39

Honor, these are deliberate statements by a prosecutor who knows that ringing the bell cannot be unrung." She moved for a mistrial.

The court found "no intentional misconduct," and it did not accept her claim that the prosecutor had been "vouching." The court viewed the "we know" comments as "his characterization of what the evidence establishes." The court was "concerned" about the prosecutor's comments suggesting that Y. feared defendant and that "the family moved out of the area and wants to be away from the area because of concerns that he might ever get out." The court told the prosecutor that "certainly there should be no effort to elicit any such facts" and expressed its belief that the admonishment it gave after the prosecutor had completed his opening statement was sufficient to prevent the jury from considering such matters. "I think any issue that's been created by this has been cured by the instructions that w[ere] given to the jury and I'm going to deny the motion for a mistrial."

When Y.'s brother testified, the prosecutor asked him on direct examination: "Well, what do you think about the fact that she wanted to be -- wanted you to be her support person in this setting?" Defendant's trial counsel objected on relevance grounds and asked that the question be stricken. The court sustained the objection and struck the question. The prosecutor then asked: "Is acting -- how do you feel about the fact that you're going -- that you're acting as her support person?" Defendant's trial counsel again objected on relevance grounds, asked that the question be stricken, and requested an admonishment. The court sustained the objection and told the jury: "Well the attorneys' questions are not evidence, so don't take anything from the questions or assume anything about them."

After the close of evidence, the court again instructed the jury: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments the attorneys discussed the case but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence."

40

In his opening argument to the jury, the prosecutor said: "[W]e told you in the opening that you would know that it was him and that you would know why he did it and that's what the evidence has proved in this case." Defendant's trial counsel interposed no objections to the prosecutor's opening argument, but she did interpose two objections during his rebuttal argument.

The first objection occurred after the prosecutor argued: "No doubt in my mind, no doubt in anyone's mind, you can find the defendant guilty beyond a reasonable doubt --" In response to defendant's trial counsel's objection, the trial court promptly admonished the jury: "Ladies and gentlemen, ignore any arguments concerning the prosecutor's personal beliefs. This is a case for you to decide. The prosecutor's personal belief has nothing whatsoever to do with your evaluation of the case." The prosecutor responded: "And that's exactly right. It certainly doesn't matter what I think about this case. Not in the least."

At the end of his rebuttal argument, the prosecutor argued: "You have to follow the evidence and that means here you have to convict Mr. O'Connell. You've been chosen to speak for this community. That's serious. You know it's serious and you know it's important. We've proven Mr. O'Connell guilty. We've proven that he's a dangerous person who goes into people's homes and harms them. That means you have to convict him now. You have to hold Mr. O'Connell accountable. You have to protect the community." The court sustained defendant's trial counsel's objection and admonished the jury at her request: "I direct you to ignore the last remark. Your role is to follow the jury instructions and ignore punishment or sentence or any other considerations about future harm."

### 2. Analysis

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and when it is reasonably probable that without such

misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Rundle* (2008) 43 Cal.4th 76, 157, disapproved on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) It is only where the trial is fundamentally unfair that we evaluate any error under the federal standard; otherwise, we apply the state law harmless error standard of review. (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514-515.) Under the state law standard, reversal is required "only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred (*Watson*, *supra*, 46 Cal.2d 818, 836)." (*People v. Breverman* (1998) 19 Cal.4th 142, 178.)

Defendant contends that the prosecutor committed prejudicial misconduct and that the trial court's sustaining of objections and admonitions regarding some of this misconduct was inadequate to prevent prejudice to defendant from the prosecutor's misconduct.

First, he identifies as misconduct the prosecutor's incantations at the beginning of his opening statement about "home," including "[h]ome is where the heart is" and "[t]here's no place like home," coupled with the prosecutor's claim that Y. had "lost" her "innocence" and "feeling of safety." Defendant's trial counsel did not object to this portion of the prosecutor's opening statement. Defendant argues on appeal that it was "immaterial commentary" on the impact on Y. of defendant's conduct. While we agree that these statements were immaterial and inappropriate, we do not see how they could have prejudiced the jury against defendant. The incantations about "home" were

42

essentially meaningless. The prosecutor's assertion that three-year-old Y. had lost her innocence and feeling of safety after being sexually assaulted by an intruder in her bedroom in the middle of the night was irrelevant, but it was so obvious that any rational juror would have assumed it for himself or herself. We can see no possibility of prejudice from these inappropriate comments. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 178.)

Second, defendant points to the prosecutor's "we know" comments in opening statement and identifies them as improper vouching. "Impermissible vouching occurs when 'prosecutors [seek] to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness."'" (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.) The prosecutor's "we know" comments, when viewed in context, were not an attempt to rely on anything other than the evidence that would be presented to the jury at trial. The context showed that the prosecutor's "we" did not refer to the prosecution but to the jury. He was saying that *the jury* would know these things because the evidence would demonstrate that these things were true. This was not improper vouching. Notably, during the prosecutor's closing argument, the court admonished the jury that "the prosecutor's personal belief has nothing whatsoever to do with your evaluation of the case." We can see no prejudicial misconduct in the prosecutor's "we know" comments in opening statement.

Third, defendant identifies as misconduct the prosecutor's allusion in opening statement to not identifying where Y. currently lived and his assertion that Y. currently feared defendant and was reluctant to testify at trial because she would have to be in defendant's presence. The allusion was improper as it suggested that defendant currently posed a danger to Y.'s safety, but we can see no potential prejudice since the prosecutor subsequently elicited from both Y. and her mother the identity of the city in which they

43

currently lived. As to Y.'s fears, the court admonished the jury during the prosecutor's opening statement that the jury was to "[d]isregard anything about Y[.]'s future f[ears]." This admonition was sufficient to dispel any potential for prejudice from the prosecutor's remarks about Y.'s fears.

Fourth, defendant complains that all of these remarks during opening statement were improper "vouching" by the prosecutor for Y.'s credibility. We do not see any improper vouching in these remarks, and, in light of the court's various admonitions, we are confident that the jurors did not understand these remarks to rely on anything other than the evidence that would be presented to them.

Fifth, defendant challenges the prosecutor's attempted questioning of Y.'s brother about his role as her support person. Since the trial court sustained defendant's objections to these questions, granted defendant's motion to strike the first one, and admonished the jury after the second one that "the attorneys' questions are not evidence, so don't take anything from the questions or assume anything about them," we can see no potential for prejudice. When a trial court has admonished the jury to disregard prosecutorial misconduct, we presume that the jury has followed the instruction unless the misconduct was "so inflammatory that any prejudicial effect could not be overcome by" the admonition. (*People v. Rocha* (1971) 3 Cal.3d 893, 901-902.) "This is not one of those exceptional cases in which the improper subject matter is of such a character that its effect on the minds of the jurors cannot be removed by the court's admonitions." (*People v. Seiterle* (1963) 59 Cal.2d 703, 710.) The prosecutor's questions concerned an irrelevant issue, the brother's feelings about his role as a support person, and it was not even clear what the prosecutor hoped to elicit in response to these irrelevant questions.

Sixth, defendant challenges the prosecutor's statement during his rebuttal argument referring to no doubt "in my mind . . . in anyone's mind" about defendant's guilt. Of course his reference to his own mind was improper, but it was promptly stricken and the jury admonished to disregard it. Because it was coupled with "anyone's

44

mind," his self-referential comment did not amount to any significant vouching. And this brief comment was not so exceptional that we cannot presume that the jury followed the court's admonition.

Finally, defendant claims that he was prejudiced by the prosecutor's exhortation to the jury that, due to the fact that defendant is "a dangerous person," "you have to convict him now" and "[y]ou have to protect the community." These remarks were certainly misconduct. However, the trial court immediately told the jury to "ignore" the last remark and admonished the jury that "[y]our role is to follow the jury instructions and ignore punishment or sentence or any other considerations about future harm." While the prosecutor's remarks were clearly improper, they were not so inflammatory that the trial court's prompt intervention and strong admonition cannot be presumed to have prevented any prejudice. Defendant's reliance on *In re Brian J.* (2007) 150 Cal.App.4th 97 (*Brian J.*) is misplaced. While the prosecutor in *Brian J.* committed misconduct in telling the jury that it needed to protect the community, the Court of Appeal concluded that the trial court's admonition was sufficient to cure any prejudice from the misconduct. (*Brian J.*, at p. 123.) *Brian J.* supports our conclusion that the trial court's admonition was sufficient to cure any prejudice from the prosecutor's improper assertion.

In sum, we conclude that, although the prosecutor engaged in several acts of misconduct, the trial court's admonitions were sufficient to cure any prejudice from those acts of misconduct that would otherwise have created a risk of significant prejudice. We reject defendant's claim that the prosecutor's misconduct was so "pervasive" that it could not be cured by admonition. Instead, we find that the prosecutor's misconduct was episodic and sporadic, mostly occurred during opening statement, and was not substantial in the context of this lengthy trial. At the same time, we condemn the prosecutor's

45

misconduct, and we admonish prosecutors to refrain from this type of inappropriate conduct.[14]

## G.  Cumulative Prejudice

Gray's brief remark concerning her belief as to defendant's intent was not prejudicial, and the prosecutorial misconduct that we have identified was also not prejudicial.  Even together, the remark and the misconduct did not result in any cumulative prejudice to defendant.

## H.  No Contest Plea and Admission

Defendant contends that he must be permitted to withdraw his no contest plea to the forcible lewd conduct count and his admission of one of the one-strike allegations. He claims that the plea and admission were "involuntary" because the trial court (1) induced the plea and admission through improper judicial plea bargaining, and (2) failed to follow through on its offer of a six-year prison term for this count and instead imposed a 25 years to life sentence for this count.[15]

### 1.  Background

After the jury failed to reach a verdict on the forcible lewd conduct count, the prosecution expressed its intent to retry that count and the accompanying one-strike allegations.  At a subsequent hearing, defendant's trial counsel explained that defendant was rejecting the prosecutor's offer and was instead going to plead no contest to the

---

[14]     Because the misconduct was quite egregious in this case, we believe it is appropriate to identify the individual prosecutors:  David Sherman and Ross Taylor.

[15]     Defendant originally contended that his plea and admission were invalid because the trial court induced the plea and admission by offering an unauthorized sentence.  He expressly withdrew this contention in his reply brief.

forcible lewd conduct count "for what I believe the Court indicated is six years determinate sentence. He'll admit the special allegation. It's very clear from the case law and the sentencing law that the 25 to life on that special allegation cannot be imposed." The court explained that "I've indicated that I would be imposing then the midterm on Count 3 of six years consecutive to the 25 year to life term associated with Count 4 and that special allegation and the 15 year to life term which will be imposed consecutive as to Count 2. So we're talking six years determinate sentence plus a consecutive 25 year to life term and a consecutive 15 year to life term." Defendant's trial counsel agreed that this was her understanding of the court's offer. The court responded: "And so that's the Court's indicated sentence which is reducing [*sic*] the no contest plea to Count 3 and the admission of the special allegation associated with Count 3; correct?" Defendant responded: "Yes, Your Honor." The court asked defendant: "And your preference is to enter the no contest plea and admit the special allegations and not proceed with trial based upon the Court's indicated sentence; correct?" Defendant responded: "Yes, Your Honor." Defendant had completed and signed a plea form in which he agreed to plead no contest to the forcible lewd conduct count on the following terms: "6 yr imposition of sentence on ct 3 - PC § 288(b)  [¶]  No imposition of sentence on PC § 667.61 special allegations on ct 3 - PC § 288(b)."

The prosecutor objected to this resolution. "We oppose the agreement that the Court has worked out with the defendant." "We think that the defendant should receive the maximum sentence of eight years from the determinate section of that statute and that the special allegation be run concurrent with how he will be sentenced on the other case or the other counts so that to keep it alive and a little bit more likely to be revived if the defendant is successful in any kind of appeal." The prosecutor confirmed that his offer to defendant had been "to strike the special allegation in exchange for Mr. O'Connell's guilty or no contest plea to Count 3 and with the understanding then that the eight-year

47

term would be imposed consecutive to the sentence that is associated with Count 2 and Count 4."

The court noted that the prosecutor's offer "has been rejected and in the Court's view then we're talking about a differential of two years and this would result in a significant savings to the county with respect to the expenditures associated with impaneling another jury and funding the defendant's defense. The Court's view of this is that it's appropriate to impose the six-year term rather than the eight-year term given that Mr. O'Connell is taking responsibility for the admission of the special allegation."

Defendant then entered a no contest plea to the forcible lewd conduct count and admitted the special allegation under section 667.61, subdivision (d)(4). The court observed that "given that this is an indicated sentence it doesn't appear to be necessary to have a probation report." The parties agreed that the prior probation report would suffice. The court set the matter for sentencing and said: "Mr. O'Connell understands at that time based upon his indication that essentially we will be imposing a 40 year to life sentence after he has served a six-year term and the six-year term being consecutive to that 40 year [to] life sentence." At a subsequent hearing on defendant's section 654 objection to this proposed sentence, defendant's trial counsel noted that "the negotiations" had involved "back and forth about eight years and six years . . . ."

At the sentencing hearing, when the court stated that it was imposing a 25 years to life sentence for the forcible lewd conduct count, defendant's trial counsel objected. "That's not exactly how this plea bargain went down. . . . That's not how the plea was . . . ." The court stated: "The effect of previous indicated sentence is that the six years that I indicated be imposed for Count 3, in addition to the 40 is now no longer in effect so the 25 year to life term that would normally be imposed to Count 3 but is not being imposed is being imposed to Count 4 is simply stayed concurrent with the Count 4 term. If the Count 4 term is found to be unlawful for some reason, Count 3 will be substituted in its place." Defendant's trial counsel continued to object. "I don't think

48

that was the plea agreement. The plea agreement was if it came back on appeal and the other charges were reversed and we were at trial again, that the Count 3 would stand because of the plea, and that's why the 25 to life on that charge would be imposed. It's not a simple an appellate court can just knock out 4 and just recalculate 3." The court replied: "Well, that remains to be seen."

## 2. Analysis

Defendant claims that his plea and admission were involuntary. "[A] plea is valid if the record affirmatively shows that it is voluntary and intelligent under the totality of the circumstances." (*People v. Howard* (1992) 1 Cal.4th 1132, 1175.)

At the time of the plea and admission, the trial court informed defendant that it would sentence him to a six-year determinate term for the forcible lewd conduct count consecutive to an indeterminate term of 40 years to life for the other counts. Defendant reasons that his plea and admission were invalid because he was misled by the trial court and actually faced an indeterminate term of 25 years to life for the forcible lewd conduct count, not a six-year determinate term. He is incorrect.

Under former section 667.61, subdivision (a), a person convicted of forcible lewd conduct with a former section 667.61, subdivision (d) finding must be punished by a life term without parole eligibility for 25 years. (Stats. 1998, ch. 936, §9, pp. 6846, 6874, eff. Sept. 28, 1998; former § 667.61, subd. (a).) The court is prohibited from striking the finding. (Stats. 1998, ch. 936, § 9, p. 6875; former § 667.61, subd. (f).) However, the life term "shall be imposed on the defendant once for any offense or offenses committed on a single victim during a single occasion. . . . Terms for other offenses committed during a single occasion shall be imposed as authorized under any other law, including

49

Section 667.6, if applicable."[16]  (Stats. 1998, ch. 936, § 9, p. 6876; former § 667.61,
subd. (g).)  Offenses occur on a single occasion when there is "a close temporal and
spatial proximity between offenses."  (*People v. Jones* (2001) 25 Cal.4th 98, 100-101
(*Jones*).)

Here, it was undisputed that the forcible lewd conduct offense and the lewd
conduct offense each qualified for a life term under former section 667.61 but were
committed on a single occasion.[17]  Hence, the trial court was limited to imposing a life
term for only one of them.  Since the court intended to and did impose a life term for the
lewd conduct offense under former section 667.61, it was not authorized to impose a
second such life term for the forcible lewd conduct count.  Instead, the authorized
punishment for the forcible lewd conduct count was the term "authorized under any other
law" for a forcible lewd conduct offense.  The authorized punishment for a forcible lewd
conduct offense in 1998 was three, six, or eight years in state prison.  (Stats. 1995, ch.
890, § 1, p. 6777.)  This was the understanding that the parties appeared to have at the
time of the plea when they referred to the decisions in *Jones*, *supra*, 25 Cal.4th 98 and
*People v. Fuller* (2006) 135 Cal.App.4th 1336 (*Fuller*).  *Jones* held that former section
667.61 (circa 1996, which was unchanged in this respect in 1998) did not authorize
multiple section 667.61 life terms for multiple offenses against a single victim on a single

---

[16]     Section 667.61 no longer contains this language.  It now provides:  "For any
offense specified in paragraphs (1) to (7) [which includes forcible lewd conduct] . . . , the
court shall impose a consecutive sentence for each offense that results in a conviction
under this section if the crimes involve separate victims or involve the same victim on
separate occasions as defined in subdivision (d) of Section 667.6."  (§ 667.61, subd. (i).)
Thus, there is no longer a prohibition on imposition of multiple life terms, but only on
imposition of multiple *consecutive* life terms, where the offenses occurred on a single
occasion against the same victim.

[17]     We requested supplemental briefing on this issue, and the parties agreed that the
court found that these offenses occurred on a single occasion.

occasion. (*Jones*, at p. 107.) *Fuller* held that this meant that, "on all counts other than the one on which the court imposes the single one strike sentence, the trial court should sentence [the defendant] under the determinate sentencing law." (*Fuller*, at p. 1343.)

It is not clear why, after defendant entered his plea and admission, the trial court erroneously decided that it was authorized to impose a second section 667.61 life term so long as it was concurrent and stayed. Former section 667.61 did not authorize such a sentence. Since no other statute authorized the imposition of a life term for the forcible lewd conduct count, the trial court was limited to imposing a determinate term.

It follows that defendant's claim that the trial court misled him about the consequences of his plea and admission lacks substance. Defendant was properly informed at the time of his plea and admission that he faced a six-year determinate midterm for this count as part of the court's indicated sentence. The fact that the trial court later made an error in imposing a 25 years to life sentence instead of a determinate term did not make defendant's earlier plea and admission involuntary.

Defendant also asserts that his plea and admission were invalid, and he must be permitted to withdraw them, because the trial court did not properly indicate the sentence that he intended to impose but instead engaged in improper judicial plea bargaining.

" '[A] court may not offer any inducement in return for a plea of guilty or nolo contendere. It may not treat a defendant more leniently because he foregoes his right to trial or more harshly because he exercises that right.' [Citations.] Because an indicated sentence is merely an instance of 'sentencing discretion wisely and properly exercised' [citation], the indicated sentence must be the same punishment the court would be prepared to impose if the defendant were convicted at trial. An indicated sentence, properly understood, is not an attempt to induce a plea by offering the defendant a more lenient sentence than what could be obtained through plea negotiations with the prosecuting authority. When a trial court properly indicates a sentence, it has made no *promise* that the sentence will be imposed. Rather, the court has merely disclosed to the

parties at an early stage—and to the extent possible—what the court views, on the record then available, as the appropriate sentence so that each party may make an informed decision." (*People v. Clancey* (2013) 56 Cal.4th 562, 575 (*Clancey*).)[18] Furthermore, "a trial court may not *bargain* with a defendant over the sentence to be imposed." (*Ibid.*) "[E]ven when the trial court has indicated its sentence, the court retains its full discretion at the sentencing hearing to select a fair and just punishment." (*Clancey*, at p. 576.) When a court decides not to impose the indicated sentence, the defendant may be permitted to withdraw his plea, and should be permitted to do so if he shows good cause therefor. (*Clancey*, at pp. 583-584.)

In *Clancey*, the California Supreme Court found that the record was "fatally ambiguous" as to whether the trial court had provided a proper indicated sentence. "What is missing is a clear statement, whether made by the court or otherwise discernible from the record, that the court's indicated sentence reflected its best judgment as to the appropriate sentence based on defendant's criminal history and his current offenses *and regardless of whether defendant was convicted by plea or at trial*." (*Clancey*, *supra*, 56 Cal.4th at p. 577.) "In examining whether the trial court improperly induced a defendant's plea to what would otherwise be a lawful sentence, the key factual inquiries are whether the indicated sentence was more lenient than the sentence the court would have imposed following a trial and whether the court induced the defendant's plea by bargaining over the punishment to be imposed." (*Clancey*, at p. 578.) A proper indicated sentence does not occur where "the court extended leniency to defendant because of his plea." (*Ibid.*)

---

[18]     The California Supreme Court issued its decision in *Clancey* after briefing was completed in this case. We requested and received supplemental briefing from the parties addressing *Clancey*.

Since the record in *Clancey* was ambiguous, the California Supreme Court decided that a conditional reversal was the appropriate remedy. "Where, as here, the record does not clearly indicate whether the purported indicated sentence represents the trial court's considered judgment as to the appropriate punishment for this defendant and the defendant's offense or offenses, regardless of whether guilt is secured by plea or at trial—*and where, as here, the party challenging the disposition has objected on that basis below*—the proper remedy is a conditional reversal with directions to the trial court on remand to resolve the ambiguity." (*Clancey*, *supra*, 56 Cal.4th at p. 578, italics added.)

Defendant is not entitled to obtain relief under *Clancey* because defendant, who is "the party challenging the disposition" by plea, did not object "on th[is] basis below." The prosecution objected to the plea and admission because it wanted defendant to receive the eight-year upper term, rather than the six-year midterm. Defendant ultimately objected to the court's imposition of a 25 years to life sentence for this count, but he did not object to that sentence on the ground of improper judicial plea bargaining. Defendant never objected on *any* basis to the trial court's indicated sentence, which would have yielded a six-year prison term for the forcible lewd conduct count.

Although the California Supreme Court did not explain its reasons for extending relief to only those who had challenged the disposition as a judicial plea bargain below, we see this restriction as a logical extension of the rule that a defendant may not challenge on appeal a disposition that he accepted below. Where a defendant agrees to accept a specified sentence, he is estopped from challenging that sentence on appeal. (*People v. Couch* (1996) 48 Cal.App.4th 1053, 1057.) The situation here is analogous. By entering his plea and admission, defendant accepted the benefit of a six-year term, and he now claims that the process by which the court arrived at that sentence was illegal. We understand the California Supreme Court's rule to be that he is estopped from challenging a beneficial sentence that he accepted and did not challenge below. As

53

defendant may not challenge his plea and admission on this basis, we need not decide whether the trial court actually engaged in judicial plea bargaining or instead properly indicated the sentence that it intended to impose.

We are left with the question of the appropriate remedy for the trial court's erroneous imposition of an unauthorized sentence. In his reply brief, defendant asked that he "either be allowed to withdraw his no contest plea, or the court must order that the bargained for six-year determinate sentence be imposed in place of the 25-year to life sentence." However, in his supplemental brief, he contends that we lack the power to order the trial court to impose a six-year determinate term and must allow the trial court to exercise its discretion to choose the appropriate determinate term. He asserts that, if the trial court exercises that discretion and imposes a sentence other than the six-year determinate term, it must permit him to withdraw his plea and admission.

We agree with defendant that the trial court has discretion on remand to impose a determinate term other than the six-year midterm. An indicated sentence is not binding. The question that defendant asks us to resolve now is whether the court must allow defendant to withdraw his plea and admission if the court does not impose the indicated term on remand. We need not resolve this question at this time since it will not arise if the trial court imposes the six-year determinate term on remand.

Nevertheless, we provide guidance to the trial court in the event that it decides not to impose the indicated sentence. The California Supreme Court has expressly declined to resolve whether the trial court *must* permit a defendant to withdraw a plea when the court decides not to impose the indicated sentence or, on the other hand, *has discretion to determine whether there is good cause* for withdrawal of the plea. (*Clancey*, *supra*, 56 Cal.4th at pp. 583-584.) The issue of whether the trial court is mandated to permit withdrawal or has discretion to deny withdrawal comes down to whether an indicated sentence is so much like a plea bargain that it should be governed by section 1192.5 or is not and therefore is governed by section 1018.

54

When a court decides not to comply with a *plea bargain*'s punishment provisions, section 1192.5 *requires* the court to permit the defendant to withdraw the plea. In all other cases, section 1018 provides that "the court may, . . . for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted." (§ 1018.) Under section 1018, "[m]istake, ignorance or any other factor overcoming the exercise of free judgment is good cause for withdrawal of a guilty plea. [Citations.] But good cause must be shown by clear and convincing evidence." (*People v. Cruz* (1974) 12 Cal.3d 562, 566; *People v. Superior Court (Giron)* (1974) 11 Cal.3d 793, 797.)

We see no ground for extending the provisions of section 1192.5 to cover a plea entered in response to an indicated sentence. Section 1192.5 is explicitly limited to plea agreements between the defendant and the prosecutor. Hence, we believe that section 1018 governs a request to withdraw a plea that was entered in response to an indicated sentence. It follows that a trial court has discretion under section 1018 to decide whether to permit a defendant to withdraw a plea entered in response to an indicated sentence when the court decides not to impose the indicated sentence.

## I. Instruction on Lewd Conduct Conviction From First Trial

Defendant contends that the trial court prejudicially erred in instructing the jury at the bifurcated trial on the one-strike allegations attached to the lewd conduct count that defendant had already been convicted of the lewd conduct count.

### 1. Background

Defendant moved in limine to exclude evidence of his lewd conduct conviction. The prosecution responded that the jury would need to know of the lewd conduct conviction in order to make findings on the one-strike allegations attached to that count that had been remanded for retrial. The prosecution explicitly stated that "we do not ask the court to invoke collateral estoppel or res judicata" with respect to this conviction.

(Italics omitted.)  Instead, the prosecution asked the court to take judicial notice of the fact of defendant's conviction on the lewd conduct count.

At the hearing on the motion, the court suggested that "res judicata issues do apply."  The defense argued that the lewd conduct conviction should be excluded under Evidence Code section 352 and "double jeopardy."  However, the defense offered to withdraw any double jeopardy objections if the court bifurcated the one-strike allegations attached to the lewd conduct count.  The court accepted the offer and bifurcated those allegations.

After the jury had reached verdicts on the burglary and aggravated sexual assault counts, defendant's trial counsel argued that the court should not tell the jury at the bifurcated trial on the one-strike allegations that defendant had previously been convicted of the lewd conduct count.  "They don't need to decide Count 4 [the lewd conduct count]. They only need to decide the special allegations."  The prosecutor argued that the prosecution was "entitled to have the jury know and understand that he's been convicted of a lewd act upon Y[.] having occurred in her bedroom on that day, November 18th, 1998.  They have to know, in other words, that this is what we're talking about."  "Like, that's got to come from the Court in one fashion or another.  Either by instruction, by judicial notice, by stipulation between the parties."

The court said:  "[W]e can do this either by way of stipulation that he's previously convicted of that charge or I could instruct the jury that he's been previously convicted of that charge."  Defendant's trial counsel opposed both a stipulation and an instruction.  "I don't think they need to find out there was a conviction.  They should know it was found true and they know that the underlying facts and know that put it in context.  I don't think

the word 'conviction' is necessary in regard to these special allegations. . . . . [¶] And the Court stating that it had been found true, seems to satisfies [*sic*] everything."[19]

The court decided to take "judicial notice of the fact of his conviction in Count 4" and "inform them [(the jury)] that Mr. O'Connell was previously convicted" of "a lewd act upon a child under 14 on -- for an event that occurred November 18, 1998." The court then told the jury that "there is a Count 4 that the defendant has been previously convicted of as it relates to November 18, 1998, lewd conduct with Y[.] and the special allegations need to be determined as to this Count 4." "The defendant was charged in Count 4 with committing a lewd and lascivious act on a child under the age of 14 on November 18, 1998 in violation of Penal Code Section 288(a). [¶] The defendant is guilty of that count and that he did willfully touch Y[.]'s body. The defendant committed the act with the intent of arousing, appealing to or gratifying the lust or passions or sexual desires of himself or the child and the child was under the age of 14 years at the time of the act. Having been previously found guilty as charged in Count 4 of committing a lewd act upon Y[.] you must now decide whether the People have proved the [special allegations] . . . ."

## 2. Analysis

Defendant claims that the trial court's instruction to the jury that he had been convicted of the lewd conduct count violated his jury trial and due process rights and was an improper use of collateral estoppel against him.

Section 667.61, subdivision (a) subjects a person convicted of lewd conduct to a 25 years to life sentence if one or more of the circumstances in section 667.61, subdivision (d) is established. (§ 667.61, subd. (a).) If none of the section 667.61,

---

[19] Defendant's trial counsel also objected to "any [additional] instructions being given at this point. They've gotten all the instructions they've needed. I think referring them back to the instructions is the most appropriate thing."

57

subdivision (d) circumstances is established, but one of the circumstances in section 667.61, subdivision (e) is established, then section 667.61, subdivision (b) subjects a person convicted of lewd conduct to a 15 years to life sentence. (§ 667.61, subd. (b).) The amended information alleged that the lewd conduct count had been committed under the circumstances in section 667.61, subdivisions (d)(4) and (e)(2).

In order to prove the section 667.61, subdivision (d)(4) circumstance, the prosecution was required to establish that defendant "is convicted of" lewd conduct and "committed the [lewd conduct] offense during the commission of a burglary of the first degree, as defined in subdivision (a) of Section 460, with intent to commit [an enumerated sex offense]." (§ 667.61, subds. (a) & (d)(4).) To prove the section 667.61, subdivision (e)(2) circumstance, the prosecution was required to establish that defendant "is convicted of" lewd conduct and "committed the [lewd conduct] offense during the commission of a burglary in violation of Section 459." (§ 667.61, subds. (b) & (e)(2).) Thus, both of the one-strike allegations required the prosecution to prove the fact of defendant's conviction for the lewd conduct count.

Defendant's conviction on the lewd conduct count was an indisputable fact that was properly subject to judicial notice. Defendant was not deprived of a jury trial on that count as defendant's contention on appeal suggests. He waived his right to a jury trial on the lewd conduct count and had a court trial that resulted in that conviction. That conviction also had been upheld on appeal. Because his conviction had not resulted from a verdict by *this jury*, the jury at the bifurcated trial needed to be informed of the fact that defendant stood convicted of the lewd conduct count. Otherwise, the jury would have no way of determining whether the lewd conduct offense had been committed under either of the alleged circumstances.

Defendant claims that the court's instruction to the jury that he had been convicted of the lewd conduct count was an improper application of collateral estoppel against him. We disagree. None of the cases that defendant cites involved a retrial of a penalty

58

allegation. Defendant's conviction on the lewd conduct count was not an *issue* that was resolved in a *prior* case; it was a *conviction* that occurred in earlier proceedings in this *same* case. As the California Supreme Court recognized in *People v. Anderson* (2009) 47 Cal.4th 92 (*Anderson*), when a defendant has been convicted of an underlying offense but a penalty allegation must be retried, the jury retrying the penalty allegation must be told that the defendant has been convicted of the underlying offense. (*Anderson*, at p. 123; *Anderson*, at p. 124 (Moreno, J. concurring).) Because defendant had waived his right to a jury trial on the lewd conduct count and had been afforded due process in the proceedings on that count, we find no merit to his claim that he was deprived of these rights by the trial court's instruction to the jury informing the jury of the fact that defendant had already been convicted of the lewd conduct count. The court's instruction did not tell the jury that any disputed factual issues had been resolved previously. It told the jury only that defendant had been convicted of the lewd conduct count.

The issues that were before the jury at the bifurcated trial concerned the *circumstances* under which the lewd conduct offense had committed. The prosecution had to prove that this offense had been committed during the burglary (a fact that was essentially undisputed) and that defendant had harbored the intent to commit a specified sex offense. Defendant does not suggest how a jury could have decided whether these circumstances were true without being told of the underlying conviction, and *Anderson* held that the retrial of a penalty allegation does not require a retrial of the underlying offense.[20] While it is true that the issue of collateral estoppel was not addressed in *Anderson*, it remains the case that *Anderson* approved of the procedure that defendant

---

[20] Defendant's trial counsel did not seek to litigate at the bifurcated trial whether defendant had committed the lewd conduct count. She sought only to avoid the use of the word "conviction." She asked the court to instead tell the jury that the lewd conduct count was "true."

now challenges. The trial court here did not violate any of defendant's rights when it informed the jury of the undisputed fact that defendant had been convicted of the lewd conduct count.

### J. Sentencing Issues

### 1. Section 654

Defendant contends that the trial court's imposition of sentences for both the lewd conduct count and the aggravated sexual assault count violated section 654 because there was not substantial evidence that defendant's lewd conduct had an intent and objective separate from that for his aggravated sexual assault.

### a. Background

Defendant's first trial was a court trial before Judge Almquist. Before announcing his verdicts, Judge Almquist asked the prosecutor if he could "set forth for me what you believe the specific events underlying -- you have three counts in the Information of -- alleging violations of 288(a). What are the events that you believe underlie [those counts]." Judge Almquist explained: "I'm, basically, looking at an oral copulation of the victim and an oral copulation of the defendant." "I'm not clear beyond that. . . . [W]hat other events would underlie the other two counts of 288(a)?" The prosecutor told Judge Almquist "they're charged in the alternative." "Those are alternate counts, Your Honor." Judge Almquist responded: "There's references to both him removing her pants, which could be, in some ways, viewed as a separate act, and him touching her in certain ways with his hand, but I'm not able to distinguish those from the information underlying Count 5 [the forcible lewd conduct count]."

Judge Almquist proceeded to find defendant guilty of only one of the three lewd conduct counts and stated that he "view[ed] [that count] as being the -- his oral copulation of the victim's vagina." At the sentencing hearing, Judge Almquist again characterized the lewd conduct count as "the first oral copulation of the three-year-old

60

victim." At the retrial, as we have discussed above in the section concerning sufficiency of the evidence, the prosecutor left open for the jury whether to base the aggravated sexual assault count on mouth-to-vagina oral copulation or on penis-to-mouth oral copulation.

Defendant argued below that section 654 precluded punishment for both the aggravated sexual assault count and the lewd conduct count because Judge Almquist had based his verdict on the lewd conduct count on mouth-to-vagina oral copulation, and, in defendant's view, the jury at the retrial had based its verdict on the aggravated sexual assault count on that same act.[21] Defendant's trial counsel argued that the court was bound by Judge Almquist's "determination" and could not "adopt [the] appellate court version." She complained that there was not "any law that stat[es] that the appellate court has the ability to substitute a factual finding of the prior offense." She also urged that section 654 would apply in either case because the acts were indivisible. The prosecutor argued that the court was not constrained by Judge Almquist's findings because they had been "thr[own] out" by the appellate court.

The trial court noted that "clearly 654 is involved here." It was initially uncertain about whether it was bound by Judge Almquist's finding or alternatively could rely on the appellate court's explanation of the basis for the lewd conduct count. Although the trial court remained "concerned about Judge Almquist's original decision," it decided that "I'm free to adopt the appellate court's factual basis for the current conviction." It

---

[21] His reasoning was that the jury's deadlock on the forcible lewd conduct count, which was expressly based on penis-to-mouth oral copulation, meant that its agreement on the aggravated sexual assault count could only have been based on mouth-to-vagina oral copulation. We have already rejected this contention in connection with defendant's challenge to the sufficiency of the evidence on the aggravated sexual assault count on this same basis. We also explained that the trial court was mistaken when it said at the sentencing hearing that the prosecutor had consistently stated at the retrial that the factual basis for the aggravated sexual assault count was mouth-to-vagina oral copulation.

therefore found that the "factual basis of Count 4 is that as recited by the appellate court which affirmed conviction on appeal on page 29 and 30 of the appellate court opinion . . . ." "Count 4 is a divisible event, a separate objective which evolved when Mr. O'Connell removed the child from her bed, removed the child's underwear, positioned the child on the floor and came to a point of arousal where he ejaculated on the floor and then proceeded to use the child as his plaything and engaged in separate commission of separate sexual offenses, including moving to the next proven act where he orally copulated the child and thereafter moved on to another act where his penis was put in the child's mouth." "[T]he Count 2 conviction is not subject to Penal Code Section 654 because I do find that, as a matter of fact, that the oral copulation of the minor victim as found in Count 2 was a separate and distinct act of a separate character from the lewd act on the child to form the basis of the Count 4 conviction; namely, that lewd act on the child of Count 4 involved removing the child from her bed, removing her underclothing, and Mr. O'Connell touching her in such a way that he was brought to the point of arousal and ejaculation and then proceeded as established by the evidence a separate and distinct assault involving his then manipulating the child and orally copulating her." The court imposed a 25 years to life sentence for the lewd conduct count and a consecutive term of 15 years to life for the aggravated sexual assault count.

### b. Analysis

"The initial inquiry in any section 654 application is to ascertain the defendant's objective and intent. If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.) "'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for

62

each offense for which he was sentenced. [Citation.]'" (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

"[M]ultiple sex acts committed on a single occasion can result in multiple statutory violations. Such offenses are generally 'divisible' from one another under section 654, and separate punishment is usually allowed." (*People v. Scott* (1994) 9 Cal.4th 331, 344, fn. 6.) Where "'[n]one of the sex offenses was committed as a means of committing any other, none facilitated commission of any other, and none was incidental' to any other, section 654 did not apply." (*People v. Harrison* (1989) 48 Cal.3d 321, 336 (*Harrison*).) "No purpose is to be served under section 654 by distinguishing between defendants based solely upon the type *or* sequence of their offenses. Such an analysis would dispense punishment on the basis of the sexual taste or imagination of the perpetrator . . . . To adopt such an approach would mean that 'once a [defendant] has committed one particular sexual crime against a victim he may thereafter with impunity repeat his offense,' so long as he does not direct attention to another place on the victim's body, or significantly delay in between each offense. [Citation.] However, it is defendant's intent to commit a number of separate base criminal acts upon his victim, and not the precise code section under which he is thereafter convicted, which renders section 654 inapplicable." (*Harrison*, at pp. 337-338.)

Substantial evidence supports the trial court's factual finding that defendant harbored "evolv[ing]" objectives that, after he removed Y.'s clothing, led him to commit the two independent acts of oral copulation that followed. Section 654 does not apply to an individual sex offense if it does not facilitate, is not a means of committing, and is not incidental to other sex offenses. (*Harrison*, *supra*, 48 Cal.3d at p. 336.) Here, the sequence of events itself reflected that defendant intended to achieve sexual gratification from *each* of his acts. The fact that defendant removed his jacket suggested that he

63

intended to spend a significant amount of time molesting Y. rather than simply pursuing a single goal. While the mouth-to-vagina oral copulation could not have been committed without removing Y.'s clothing, that did not mean that defendant did not intend to achieve independent sexual gratification from the removal of Y.'s clothing and his fondling of her body. In any case, the penis-to-mouth oral copulation, which, as we have already discussed, was the jury's probable basis for the aggravated sexual assault count, was divisible from the removal of Y.'s clothing, the fondling of her body, and the mouth-to-vagina oral copulation that preceded it. Whether the trial court was bound by Judge Almquist's finding (mouth-to-vagina oral copulation) or this court's premise (removal of clothing/fondling) as to the basis for the lewd conduct count, defendant's objectives for those acts were plainly independent of his objective for the penis-to-mouth oral copulation. The removal of Y.'s clothing, the fondling of her body, and the mouth-to-vagina oral copulation did not facilitate, were not incidental to, and were not a means of committing the penis-to-mouth oral copulation. Consequently, the trial court's decision that section 654 did not apply was supported by substantial evidence.

Defendant claims that the trial court's theory as to why section 654 did not apply was invalid because it conflicted with the theory upon which the lewd conduct count was tried *in the first trial* and the finding by Judge Almquist *in the first trial*. Since we remand this matter for resentencing, we need not resolve the issue of the validity of the trial court's findings at the sentencing hearing. The only issue we address, for the guidance of the trial court on remand, is whether the record contains substantial evidence to support a finding that section 654 does not preclude imposition of sentence for both the lewd conduct count and the aggravated sexual assault count.

## 2.  Multiple One-Strike Findings

Defendant contends that the jury's true finding on the section 667.61, subdivision (e)(2) one-strike allegation cannot stand because the jury also made a true finding on the section 667.61, subdivision (d)(4) allegation.[22]  His claim has merit. Section 667.61, subdivision (e)(2) states:  "*Except as provided in paragraph (4) of subdivision (d)*, the defendant committed the present offense during the commission of a burglary in violation of Section 459."  (§ 667.61, subd. (e)(2), italics added.)  Hence, the section 667.61, subdivision (e)(2) circumstance cannot be true if the section 667.61, subdivision (d)(4) circumstance is true.  The appropriate remedy is to strike the section 667.61, subdivision (e)(2) finding, and we will direct the court to do so on remand.

## IV.  Disposition

The judgment is reversed, and the matter is remanded with the following directions.  The trial court shall strike the section 667.61, subdivision (e)(2) finding as to the lewd conduct count and resentence defendant.

---

[22]      The defense asked the court to instruct the jury on only section 667.61, subdivision (d)(4) and not section 667.61, subdivision (e)(2) because, it argued, the former precluded the latter.  The court rejected its request and instructed on both circumstances.

_____

Mihara, J., Acting P. J.


WE CONCUR:




_____

Márquez, J.




_____

Grover, J.